**Robert BURGENER, Plaintiff and Appellant,**

v.

**Rachel BUSHAW and Michael Bushaw; d/b/a Corner Bar, and Terri Gothberg, Personal Representative of the Estate of Charles E. Gothberg, Defendants and Appellees.**

**Oliver JENSON, Jr. and Debby Jenson, Plaintiffs and Appellants,**

v.

**Rachel BUSHAW and Michael Bushaw; d/b/a Corner Bar, and Terri Gothberg, Personal Representative of the Estate of Charles E. Gothberg, Defendants and Appellees.**

Civil Nos. 950182, 950183.

Supreme Court of North Dakota.

March 19, 1996.

Neil A. McEwen (argued), Thief River Falls, for plaintiffs and appellants.

Howard D. Swanson (argued) and F. John Marshall (no appearance), of Letnes, Marshall & Swanson, Ltd., Grand Forks, for defendants and appellees Rachel Bushaw and Michael Bushaw.

Dwain E. Fagerlund (argued), of Johannson, Taylor, Rust, Tye & Fagerlund, P.A., Crookston, for defendant and appellee Terri Gothberg.

NEUMANN, Justice.

Robert Burgener, Oliver Jenson, Jr., and Debby Jenson appeal from amended judgments entered upon offers of judgment pursuant to Rule 68(a), N.D.R.Civ.P. We reverse and remand.

This dispute arises from a two-car accident which occurred on January 14, 1989, near Grand Forks, North Dakota. A vehicle driven by Charles Gothberg crossed the center line and collided with a vehicle driven by Oliver Jenson, Jr. Charles Gothberg was killed in the accident. Jenson and Robert Burgener, a passenger in Jenson's vehicle, were injured. Jenson and Burgener received wage loss and medical benefits from General Casualty Insurance Company, which provided no-fault coverage on Jenson's vehicle.

Burgener, Jenson, and Jenson's wife Debby brought actions against Terri Gothberg, as personal representative of Charles Gothberg's estate [hereafter "Gothberg"], and Rachel and Michael Bushaw, doing business as the Corner Bar. The complaints alleged negligence and dram shop claims. Settlement negotiations ultimately resulted in Gothberg and the Bushaws making offers of judgment under Rule 68(a), N.D.R.Civ.P. Gothberg, the Bushaws, and their insurers offered Burgener $24,000 and the Jensons $20,000 to settle their claims. The offers included the following provision:

> ". . . upon the condition that Terri Gothberg, the Estate of Charles Gothberg; Rachel Bushaw and Michael Bushaw, d/b/a Corner Bar; Auto Owners Insurance Company [Charles Gothberg's insurer]; and Acceptance Insurance Corporation [the Bushaws' dram shop insurer] be released from all claims arising from the accident which is the subject matter of this action, including all claims held by third parties for subrogation or indemnity. . . ."

Burgener and the Jensons accepted the offers in writing. Separate checks were tendered to Burgener and the Jensons, also naming as payees their attorney and General Casualty, the no-fault carrier. Counsel for Burgener and the Jensons returned the checks, claiming General Casualty should not be included as a payee.

Under Rule 68(a), N.D.R.Civ.P., Burgener and Jenson submitted proposed judgments to the district court for the amount of the settlements, $24,000 and $20,000 respectively, plus costs. The judgments were entered on December 28, 1994.

Gothberg and the Bushaws moved to vacate or amend the judgments, alleging the conditions of the offers had not yet been fulfilled. General Casualty had commenced arbitration proceedings against Auto Owners, Charles Gothberg's insurer, for recovery of no-fault benefits paid to Burgener and Jenson. The arbiters ordered Auto Owners to reimburse General Casualty $9,435.15 it had

paid to Burgener and $7,372.78 it had paid to Jenson in no-fault benefits. Gothberg and the Bushaws asserted that, because the settlements released all claims against them and their insurers, including claims of third parties for subrogation, the judgments should be reduced by the amounts Auto Owners had been ordered to pay in arbitration. The district court agreed, and amended judgments were entered reflecting subtraction of those amounts. Burgener and the Jensons appealed.

■ Resolution of this appeal requires consideration of our no-fault law, Ch. 26.1–41, N.D.C.C. The benefits received by Burgener and Jenson from General Casualty were basic no-fault benefits. *See* Section 26.1–41–01(2), N.D.C.C. Section 26.1–41–16 gives the no-fault insurer a right of subrogation for basic no-fault benefits against any tortfeasor who is not a "secured person." A "secured person" is defined to include the operator of a secured motor vehicle, which means a vehicle insured as required by law. *See* Section 26.1–41–01(19) & (20), N.D.C.C. Because Charles Gothberg was a secured person, General Casualty had no right of subrogation against Gothberg or his insurer. However, the Bushaws, as bar owners defending a dram shop claim, were not secured persons under the statute, and General Casualty therefore had a potential subrogation interest against them for basic no-fault benefits paid to Burgener and Jenson.

■ Section 26.1–41–17, N.D.C.C., provides a separate mechanism for an insurer to recover basic no-fault benefits from a secured person's insurer under limited circumstances:

"*Equitable allocation of losses among insurers.* A basic no-fault insurer may recover no-fault benefits paid to or for the benefit of an injured person from the motor vehicle liability insurer of a secured person if:

"1. The injured person has sustained a serious injury; or

"2. The injury results from an accident involving two or more motor vehicles, at least one of which is a motor vehicle weighing more than six thousand five hundred pounds [2948.35 kilograms] unloaded.

"The right of recovery and the amount thereof must be determined on the basis of tort law without regard to section 26.1–41–08 by agreement between the insurers involved, or, if they fail to agree, by binding intercompany arbitration under procedures approved by the commissioner. The amount of recovery under this section may not exceed the limits of liability of the secured person's motor vehicle liability insurance policy or other security, reduced by the amount of the liability for tort claims against the secured person covered by the policy or other security."

In contrast to Section 26.1–41–16, this section does not provide a *subrogation* interest against the tortfeasor, but creates a right of equitable allocation directly against the tortfeasor's liability insurer through agreement or intercompany arbitration. In this case, General Casualty did not seek subrogation under Section 26.1–41–16, but rather sought and received equitable allocation through arbitration directly against Auto Owners, Charles Gothberg's insurer, under Section 26.1–41–17, N.D.C.C.[1]

The question presented on appeal is whether the settlement agreement between the parties authorized the district court to reduce the judgments by the amounts Auto Owners was ordered to pay to General Casualty under the equitable allocation statute. The result in this case is controlled by our decision in *Imperial Casualty & Indemnity Co. v. General Casualty Co.*, 458 N.W.2d 335 (N.D.1990).

In *Imperial*, Anthony Kulig had been injured when his vehicle was struck by one driven by Carolyn Tinjum. Kulig's vehicle was insured by Imperial, and Tinjum's by General. In addition to the $15,000 basic no-

1. Equitable allocation applied in this case because Burgener and Jenson sustained "serious injury." *See* Section 26.1–41–01(21), N.D.C.C.

fault coverage required by statute,[2] Kulig also carried $25,000 in excess no-fault benefits. Kulig received the full $40,000 in no-fault benefits from Imperial for economic losses resulting from the accident. Kulig and his wife subsequently settled their tort claims against Tinjum for $37,500. The Kuligs executed a general release, releasing Tinjum and General from all claims relating to the accident. Although General was aware of Imperial's potential claims for equitable allocation and subrogation, Imperial was not made a party to the settlement nor given notice.

Imperial sued General for reimbursement of the $40,000 in no-fault benefits it had paid to Kulig. Imperial appealed from a summary judgment dismissing its claims. On appeal, we first concluded that, as to the $15,000 in basic no-fault benefits, Imperial had no subrogation rights but could seek equitable allocation under the statute[3] through arbitration. *Imperial, supra,* 458 N.W.2d at 337.

We next addressed Imperial's right to reimbursement of the $25,000 in excess no-fault benefits. Concluding Imperial had a subrogation right against Tinjum for the excess benefits, we noted that, under general subrogation principles, release of the injured plaintiff's claims against the tortfeasor released the dependent subrogation rights as well. However, we recognized an exception to that general principle:

> "Several jurisdictions recognize an exception to this general principle. They have held that when a tortfeasor or the tortfeasor's liability insurer, with notice of the subrogation claim of the injured party's insurer, procures a general release by settling with the injured person in the absence of that person's insurance company, the release will not affect the subrogation rights of the injured party's insurance company."

*Imperial, supra,* 458 N.W.2d at 338.

■ Under general subrogation principles, release of the injured plaintiff's claim extinguishes the subrogation claim as well because it is *dependent upon* the validity and enforceability of the plaintiff's underlying claim. We have said that "[s]ubrogation is 'a legal operation by which a third person who pays a creditor succeeds to his rights against the debtor as if he were his assignee.'" *Meyer v. North Dakota Workers Compensation Bureau,* 512 N.W.2d 680, 682 (N.D.1994) (quoting *Ness v. St. Aloisius Hospital,* 313 N.W.2d 781, 782 (N.D.1981)). Because a subrogation claim flows directly from the underlying claim against a tortfeasor, it was necessary in *Imperial* to apply the exception to the general rule.

■ In this case, however, General Casualty did not assert a subrogation claim against Auto Owners. Rather, it sought equitable allocation against Auto Owners under Section 26.1–41–17, N.D.C.C. Equitable allocation, unlike subrogation, does not require that the injured party have a valid, enforceable claim against the tortfeasor. To the contrary, the statutory scheme expressly provides that the injured party has no claim against the "secured person" tortfeasor for injuries compensated by basic no-fault benefits. Section 26.1–41–08(1)(b), N.D.C.C.; *Reisenauer v. Schaefer,* 515 N.W.2d 152, 154–155 (N.D.1994). Thus, equitable allocation is a purely statutory remedy between insurers, a remedy separate and distinct from subrogation, which does not rely upon the enforceability of an underlying claim against the tortfeasor. Accordingly, because the enforceability of Burgener's and the Jensons' underlying claims against Gothberg was immaterial to General Casualty's statutory claim for equitable allocation, their gen-

---

2. The statutory minimum has since been raised to $30,000. *See* Sections 26.1–41–01(2) and 26.1–41–02, N.D.C.C.

3. The no-fault law applicable to the Kulig accident, Ch. 26–41, N.D.C.C., has since been repealed and replaced by Ch. 26.1–41, N.D.C.C. *See* 1985 N.D. Sess. Laws ch. 316; *Steenson v.*

*General Casualty Co.,* 397 N.W.2d 461, 462 n. 1 (N.D.1986); *Olmstead v. Miller,* 383 N.W.2d 817, 819 n. 2 (N.D.1986). For purposes of this case, however, the statutory provisions regarding subrogation and equitable allocation have not materially changed, and *Imperial* remains good law under Ch. 26.1–41, N.D.C.C.

eral release of all claims against Gothberg and Auto Owners did not release the equitable allocation claim. Because the equitable allocation claim is wholly independent of Burgener's and the Jensons' claims, they were powerless to affect that claim.

The underlying policy rationale of *Imperial* also supports the conclusion that the releases in this case did not affect General Casualty's right to enforce its equitable allocation claim, nor require Burgener and the Jensons to satisfy that claim from their settlements. In adopting the exception to the general rule, we quoted with approval the rationale of the Supreme Court of Minnesota:

" 'To hold that such a settlement destroys an insurer's subrogation rights would have the practical effect of encouraging a tortfeasor or his liability insurer to disregard notice of an insurer's valid subrogation claim and attempt to procure a general release from the insured. We believe that the tortfeasor and his liability insurer have a duty to act in good faith under such circumstances. Therefore, we hold that where a tortfeasor and his liability insurer willfully disregard notice of the subrogation claim of the injured person's insurer and enter into a separate settlement with the injured person, such a settlement does not defeat his insurer's subrogation rights.' "

*Imperial, supra,* 458 N.W.2d at 338 (quoting *Travelers Indemnity Co. v. Vaccari,* 310 Minn. 97, 245 N.W.2d 844, 848 (1976)).

We also relied upon *Home Insurance Co. v. Hertz Corp.,* 71 Ill.2d 210, 16 Ill.Dec. 484, 375 N.E.2d 115 (1978), in which the Supreme Court of Illinois rejected an earlier Illinois decision, *Inter Insurance Exchange of Chicago Motor Club v. Andersen,* 331 Ill.App. 250, 73 N.E.2d 12 (1947), which had held that a release given by an injured party extinguished the insurer's subrogation claim. We quoted with approval the court's reasoning:

" 'The difficulty with the *Andersen* rule, in our opinion, is that its application in the circumstances here is fundamentally unfair to both the insured and his insurer. Denied enforcement of its subrogation rights against the real wrongdoer, the insurer must instead seek recovery from its own

insured, an obviously unpalatable alternative. Thus the tortfeasor and his own liability insurer, if any, escape payment for damage caused by the tortfeasor, while the tort victim is effectively denied payment from his own insurance carrier *and* from the tortfeasor. The *Andersen* rule in these circumstances constitutes a trap for the unwary insured plaintiff. While no fraud is alleged here, the rule itself encourages fraud or, at the very least, sharp practice on the part of the tortfeasor or his insurance carrier. The insured may be an unsophisticated, unrepresented party presented with a full and final release which he is told he must sign in order to effect a needed settlement. To require him to execute a release of all claims, even though the tortfeasor has knowledge of the insurer's interest and the probable existence of a standard insurance policy provision obligating the insured to protect the insurer's subrogation rights, is simply not consistent with fair dealing and ought not to be encouraged. In short, adoption of the *Andersen* rule would (1) permit the tortfeasor to escape liability for the amounts paid by the insurer, (2) require the tort victim to go uncompensated as to the amounts paid by the insurer even though he has paid insurance premiums and has also suffered loss at the hands of the tortfeasor defendant, (3) force the insurer to sue his own injured insured, and (4) place a premium on sharp practice and dishonesty.' "

*Imperial, supra,* 458 N.W.2d at 338–339 (quoting *Hertz, supra,* 16 Ill.Dec. at 486–487, 375 N.E.2d at 117–118).

Those policy concerns are equally applicable in this case, which is factually very similar to *Imperial.* The defendants and their insurers were fully aware of the potential claim for equitable allocation, as evidenced by their inclusion of General Casualty's name on the settlement checks, yet they did not include General Casualty in settlement negotiations. As in *Imperial,* there is no evidence that the settlements exhausted the liability policy limits. *See Imperial, supra,* 458 N.W.2d at 339.

In *Imperial, supra,* 458 N.W.2d at 339, we noted there was "no indication in the record

that any part of the $37,500 the Kuligs received in settlement of their action against Tinjum was paid to the Kuligs for purposes of reimbursing Imperial for the excess no-fault benefits it had paid to the Kuligs." We do not read the provision in this settlement agreement, whereby Burgener and the Jensons agreed to release claims held by third parties for subrogation or indemnity, to mean they intended part of their settlement proceeds to cover General Casualty's claim for equitable allocation against Auto Owners. Although the release in this case includes somewhat broader language than the general release in *Imperial,* it does not clearly apprise an unwary plaintiff that he is agreeing to pay the statutory equitable allocation claims of his own no-fault insurer from his settlement proceeds. Even with this broader settlement language, the potential for fraud and overreaching upon an unwary injured party by an unscrupulous insurer is just as great. Following our rationale in *Imperial,* we refuse to permit tortfeasors and their insurers to escape liability for amounts paid by the plaintiff's insurer, requiring the victim to go uncompensated, by settling without notifying or including the no-fault insurer. To hold otherwise would place a premium on sharp practice and dishonesty. The import of *Imperial* is clear: a tortfeasor's insurer who settles with an injured party, with knowledge of potential reimbursement claims of a no-fault insurer, does so at its own risk. *Imperial* places upon the insurer the burden of bearing any ambiguities arising from the settlement. The simple solution for insurers is to make certain the no-fault carrier is included in the settlement. If, as the defendants and their insurers assert here, all parties intended the amount of the settlement to include all reimbursement claims of the no-fault insurer, there was no valid reason for not including the no-fault carrier in settlement negotiations. If the no-fault carrier is to be fully reimbursed from the settlement proceeds, it surely will not object to the settlement.

■ We do not mean to imply that a tortfeasor and its insurer may never "buy their peace" in a settlement with the injured party. If the settlement agreement, in language readily understandable to an average injured party, clearly, unambiguously, and explicitly provides that all subrogation, indemnity, and equitable allocation claims of no-fault insurers will be paid from the settlement proceeds, the agreement may be enforceable. Under *Imperial,* however, the burden of establishing such a clear and explicit agreement falls upon the tortfeasor and its insurer. The agreement in this case did not clearly, unambiguously, and explicitly advise a non-law-trained plaintiff that the settlement would be subject to General Casualty's equitable allocation claims for reimbursement of basic no-fault benefits paid to Burgener and Jenson.

Further problems arise in this case from the parties' use of Rule 68(a), N.D.R.Civ.P., offers of judgment. Rule 68(a) provides, in pertinent part:

"At any time more than 10 days before the trial begins, any party may serve upon an adverse party an offer, denominated as an offer under this rule, to settle a claim for the money or property or to the effect specified in the offer, with costs then accrued and to enter into a stipulation dismissing the claim or to allow judgment to be entered accordingly. If within 10 days after the service of the offer, the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment upon order of the court."

■ Our Rule 68(a) is derived from Rule 68(a), F.R.Civ.P. *See* Explanatory Note, Rule 68(a), N.D.R.Civ.P. When our rule is derived from the corresponding federal rule, we may look to federal interpretive caselaw and authorities in construing our rule. *E.g., State v. Davenport,* 536 N.W.2d 686, 690 (N.D. 1995).

■ Under Rule 68(a), the offer of judgment "must specify a definite sum for which judgment may be entered, which plaintiff can either accept or reject," and "[i]t must be unconditional." 12 Wright & Miller, Federal Practice and Procedure: Civil § 3002 (1973); *see also Herrington v. County of Sonoma,* 12 F.3d 901, 907 (9th Cir.1993); *Mallory v. Ey-*

*rich,* 922 F.2d 1273, 1278–1279 (6th Cir.1991); *Grow v. Ruggles,* 860 P.2d 1225, 1227 (Alaska 1993) (construing Alaska's version of Rule 68); *Stockton Kenworth, Inc. v. Mentzer Detroit Diesel, Inc.,* 101 Nev. 400, 705 P.2d 145, 148 (1985) (construing Nevada's version of Rule 68). Noting Rule 68 judgments are "self-executing," the court in *Mallory, supra,* 922 F.2d at 1279, explained:

"Rule 68 also leaves no discretion in the district court to do anything but enter judgment once an offer has been accepted. By directing that the clerk *shall* enter judgment after proof of offer and acceptance have been filed, the explicit language of the rule signifies that the district court possesses no discretion to alter or modify the parties' agreement. The Sixth Circuit has indicated that the entry of a Rule 68 judgment is ministerial rather than discretionary:

"We agree with the plaintiffs that the clerk was required to enter judgment [under Rule 68].... The clerk refused to enter judgment because the parties had not resolved their dispute on whether 'costs' included attorney's fees. However, Rule 68 does not condition entry of judgment on the resolution of all issues. It explicitly states, 'the clerk *shall* enter judgment.' (Emphasis added.) Because the court clerk failed to perform the ministerial act of entering judgment, the court should have entered judgment *nunc pro tunc.*

"*Oates v. Oates,* 866 F.2d 203, 208 (6th Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1025 (1989)."

■ By its terms, the rule envisions entry of judgment in the definite amount stated in the offer, plus costs. Given the explicit language of Rule 68, N.D.R.Civ.P., Burgener and the Jensons were entitled to rely upon an expectation that they would receive judgments of $24,000 and $20,000 plus costs, respectively, upon the offers of judgment. Under Rule 68, the plaintiffs were entitled to have judgments entered for those amounts, as they did on December 28, 1994. The district court was without authority under Rule 68(a) to subsequently enter amended judgments in lesser amounts.

We conclude the district court erred in amending the judgments to subtract amounts Auto Owners was ordered to pay to General Casualty in intercompany arbitration. Burgener and the Jensons were entitled to entry of judgments for $24,000 and $20,000, respectively, plus costs. We reverse the amended judgments and remand for entry of judgments in accordance with this opinion.

VANDE WALLE, C.J., and SANDSTROM and MESCHKE, JJ., concur.

BERYL J. LEVINE, Surrogate Judge, concurs in the result.